UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11051-RGS

HELEN G. SCHWARTZ,
as Trustee in Bankruptcy for ROLAND RODRIGUEZ

v.

INDEPENDENT APPRAISALS, LLC, CAROLYN A. JENKINS, KERRY A
MCDERMOTT, NEXTGEN REALTY, INC., MARC D. SCHULZE, ESQ. d/b/a
LAW OFFICES OF MARC D. SCHULZE, MORTGAGEIT, INC., IGNAZIO J.
AMATO d/b/a IGA APPRAISAL SERVICES, DAVID S. STRAUSS, W.
DARRYL FRY, PLAZA HOME MORTGAGE, INC., MARK J. GLADSTONE,
P.C., THERMOPYLAE ENTERPRISES CORP. d/b/a KELLER WILLIAMS
REALTY, MELANIE F. DAYE, FIRST BANK d/b/a FIRST BANK, INC.,
BRUCE L. NAMENSON, ESQ. d/b/a NAMENSON & ASSOCIATES,
WORLDWIDE SETTLEMENTS, INC., and LEHMAN BROTHERS BANK, FSB
n/d/b/a AURORA BANK, FSB

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

November 17, 2011

STEARNS, D.J.

This case arises from Roland Rodriguez's alleged "entrapment in an elaborate
and illegal property-flipping and equity skimming scheme perpetrated against him" by
the defendants, "a group of real estate speculators, real estate agents and brokers,
appraisers, mortgage brokers, attorneys and mortgage originators." Compl. ¶ 1.

PROCEDURAL BACKGROUND

Plaintiff Helen Schwartz filed this lawsuit on April 11, 2011, as Trustee in

Bankruptcy for Rodriguez. Schwartz alleges several dozen counts against the various defendants involving Rodriguez's purchase of five Massachusetts properties: 72 Spencer Avenue in Chelsea, purchased on January 31, 2007; 75 Essex Street in Chelsea, purchased on February 9, 2007; 100 Needham Street in Dedham, purchased on February 20, 2007; 76 Bellevue Street in Dorchester, purchased on March 26, 2007; and 93 Claybourne Street in Boston, purchased on April 20, 2007. Schwartz pleads various claims for intentional misrepresentation, negligent misrepresentation, professional malpractice, negligence, unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A (Chapter 93A), aiding and abetting, breach of fiduciary duty, unjust enrichment, and civil conspiracy.

On June 24, 2011, defendants Independent Appraisals, LLC (Independent Appraisals), Carolyn Jenkins, and Kerry McDermott moved to dismiss on the grounds that the action is barred by Massachusetts statutes of limitations. On July 1, 2011, defendants NextGen Realty, Inc. (NextGen), Thermopylae Enterprises Corp., doing business as Keller Williams Realty (Keller), and Melanie Daye (collectively, the broker defendants) moved to dismiss on the same grounds. On July 6, 2011, defendant attorney Mark Gladstone moved to dismiss on statute of limitations grounds, while also asking that the court levy costs and sanctions against Schwartz. On August 31, 2011, Ignazio J. Amato (doing business as IGA Appraisal Services) moved to dismiss on

statute of limitations grounds, as did Worldwide Settlements, Inc. on September 2, 2011.[1]

On August 12, 2011, Schwartz voluntarily dismissed from the suit defendants MortgageIt, Inc., Plaza Home Mortgage, Inc., First Bank, Lehman Brothers Bank (now doing business as Aurora Bank, FSB), David Strauss, and Darryl Fry. *See* Dkt # 57. On September 28, 2011, the court entered default judgments against Marc Schulze and Bruce Namenson. *See* Dkt ## 69-70. Immediately prior to the hearing, NextGen withdrew its motion to dismiss, apparently in anticipation of a voluntary dismissal in Bankruptcy Court. *See* Dkt # 71.

## BACKGROUND

For the purposes of these motions, the following pertinent factual allegations are taken in the light most favorable to the Trustee as the nonmoving party. The Trustee alleges that the named "individuals and entities collectively worked to ensnare Mr. Rodriguez to purchase [dilapidated properties] at [grossly inflated prices] using massive 'no document' mortgages that the mortgage originators quickly unloaded in the secondary market for [substantial profits] after [the closings]." Compl.¶ ¶ 1-2. She further alleges that each participant in the scheme "extracted thousands of dollars in

---

[1] Worldwide supplemented its motion on September 16, 2011. Worldwide's counsel did not appear at the rescheduled hearing, claiming not to have received the court's rescheduling notice.

fees and commissions from Mr. Rodriguez and then just walked away; leaving him with enormous mortgage indebtedness on [residential properties] whose true condition[s] and market value[s] were dramatically [lower] than what each lead Mr. Rodriguez to believe." *Id.* ¶ 2.

Rodriguez's purchase of the five properties followed the same pattern. Boston Equity Investments (BEI), aided by the defendant real estate agents and brokers, sought out multi-family homes in low-income neighborhoods whose actual value was well below what the seller had listed.[2] BEI would obtain an option to purchase the property at the depressed market price. The "hand-picked" appraiser defendants would then issue an inflated appraisal of the property's value.[3] According to the Trustee, the appraisals included (1) inaccurate descriptions of the properties and/or the neighborhoods in which they were located, and (2) misleading descriptions of the comparable properties that were used to determine market value.

BEI then recruited out-of-state straw purchasers like Rodriguez with above-

---

[2] BEI, a company formed in 2006 by Joshua Brown and Brian Frank, is one of many such companies formed by these two men to serve as vehicles for property flipping and equity-skimming. BEI, Brown, and Frank are not, however, defendants in this action.

[3] Independent Appraisals, Jenkins, and McDermott appraised the Spencer Avenue, Needham Street, Bellevue Street, and Claybourne Street properties. Amato appraised the Essex Street property.

average credit scores to participate in "investment opportunities." Rodriguez, a resident of Texas, was promised $10,000 (or more) for each purchase of a BEI property. BEI also promised to make the first three mortgage payments, manage the properties and keep them fully occupied, convert the properties into condominiums, sell them (or buy them directly if they did not sell within 180 days), assist in refinancing the mortgage at a lower rate after twelve mortgage payments, pay all closing costs, and put money in escrow for property maintenance. It is unclear from the record whether any of these promises were kept, although the Trustee alleges that for the most part they were not.

In the second phase of the scheme, BEI worked with the mortgage brokers to ensure that Rodriguez was approved for mortgage loans. Schwartz claims that the financing for each of the five properties was secured by falsifying Rodriguez's loan applications to improve his creditworthiness on paper (without his knowledge or consent). The inflated appraisals were also used to persuade lenders that sufficient collateral existed to guarantee repayment of the loans.

Rodriguez, for his part, admits that he did not visit or cause any of the properties to be inspected before signing the purchase papers. He instead relied on the brokers'

representations. Schwartz alleges that the brokers did not act in his best interest.[4] They failed to provide meaningful advice or services despite being handsomely compensated from the mortgage proceeds. Moreover, they failed to disclose to Rodriguez: (1) that BEI had purchased options on each of the properties for less than the purchase price; (2) the relationship between BEI, Brown, and Frank and themselves and the appraisers; and (3) that BEI would be paid the difference between the purchase price and the option price from the proceeds of the mortgages.

Schwartz further alleges that at the closing, the lenders' attorneys – also hand-picked by BEI – misrepresented BEI's take – the difference between the purchase price and option price – on the HUD-1 settlement statement as a "mortgage payoff" even though the attorneys knew that BEI held no mortgage or lien on the subject properties. The attorneys also falsely stated on the HUD-1 settlement statements that Rodriguez had brought tens of thousands of dollars with him to the closing.[5]

Rodriguez mailed Chapter 93A demand letters to Independent Appraisals, Jenkins, and McDermott regarding the 72 Spencer Avenue property on or about June

---

[4] The named broker defendants are NextGen, Keller, and Daye. NextGen was the broker for the Spencer Avenue, Essex Street, and Needham Street properties. Keller and Daye acted as the brokers for the Bellevue Street and Claybourne Street properties.

[5] The only attorney who remains a defendant in this action is Gladstone, who acted as the attorney for Plaza at the Needham Street closing.

18, 2007. These defendants responded by letter on July 18, 2007, denying any wrongdoing and refusing any offer of settlement. On January 23, 2008, Rodriguez mailed demand letters to Independent Appraisals, Jenkins, and McDermott regarding the Needham Street property. On or about January 29, 2010, Rodriguez sent demand letters to NextGen, Amato, Strauss, Keller, and Daye.[6] On February 20, 2010, Amato and Strauss responded denying liability; on February 25, 2010, Keller and Daye did the same; followed by NextGen both on February 26, 2010, and March 19, 2010. Rodriguez did not serve Worldwide or Gladstone with demand letters.[7]

## DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007), disavowing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.*, 550 U.S. at 555 (internal citations and quotation marks omitted). *See also*

---

[6] The record does not indicate the substance of these letters.

[7] The only real estate closing firm that remains a defendant is Worldwide, which was involved in the financing of the Bellevue Street and Claybourne Street properties.

*Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007). Dismissal for failure to state a claim will be appropriate if the pleadings fail to set forth "'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997), quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988). A complaint will also be dismissed where the statute of limitations bars its claims. *See* Fed. R. Civ. P. 12(b)(6).

### *Tort Claims: Statute of Limitations*[8]

Tort actions "shall be commenced only within three years next after the cause of action accrues." Mass Gen. Laws ch. 260, § 2A. Under Massachusetts law, tort actions accrue when a plaintiff is injured. *See, e.g.*, *Joseph A. Fortin Constr., Inc. v.*

---

[8] As against the remaining defendants Schwartz alleges negligence (Independent Appraisals, Jenkins, McDermott, Amato, Keller, Daye), aiding and abetting (Independent Appraisals, Jenkins, McDermott, Amato, Keller, Daye); breach of fiduciary duty (Keller, Daye); unjust enrichment (Keller, Daye); civil conspiracy (all remaining defendants); intentional misrepresentation (Gladstone, Worldwide); negligent misrepresentation (Gladstone, Worldwide); and Chapter 93A (Independent Appraisals, Jenkins, McDermott, Amato, Keller, Daye). Most of the claims, including that of breach of fiduciary duty, are torts. *See* Restatement (Second) of Torts § 874 (1979)*; see also In re American Cartage, Inc.,* 438 B.R. 1, 12 (Bankr. D. Mass. 2010). Unjust enrichment and Chapter 93A are equitable remedies, although a claim of unjust enrichment is viable only in instances where a remedy at law is lacking. *See Massachusetts v. Pace*, 616 F. Supp. 815, 822 (D. Mass. 1985). Although a claim for unjust enrichment may sound in contract, Schwartz's claim for unjust enrichment sounds in tort. *See e.g., Goldstein v. Sav. Bank Life Ins. Co. of Massachusetts*, 435 Mass. 760, 761 n.2 (2002).

*Massachusetts Hous. Fin. Agency*, 392 Mass. 440, 442 (1984). Accrual dates are established by the same principles that govern the determination of the underlying actions. *Schwartz v. The Travelers Indem. Co.*, 50 Mass. App. Ct. 672, 678 (2001). Under the "discovery rule" exception, however, a limitations period does not begin to run where a plaintiff "did not know or could not reasonably have known that he or she may have been harmed by the conduct of another." *Koe v. Mercer*, 450 Mass. 97, 101 (2007), citing *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 205 (1990). In other words, a statute of limitations may be extended if a cause of action is "inherently unknowable." *See Bowen*, 408 Mass. at 206. This is a rule of reason. "The important point is that the statute of limitation[s] starts to run when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused [him] injury." *Bowen*, 408 Mass. at 207.

All of the moving defendants allege that the Trustee's action is time barred by the relevant statute of limitations. Defendants argue that any alleged harm to Rodriguez accrued on the respective 2007 closing dates of each of the five property transactions because it was on those dates that Rodriguez "had the means at [his] disposal to learn of the defects." *Melrose Hous. Auth. v. N.H. Ins. Co.*, 402 Mass. 27, 33 (1988). Defendants contend that any misrepresentations regarding the properties were readily discoverable because a simple visual inspection would have revealed their

descriptions, neighborhood locations, and the comparables that were used in conducting the appraisals. *See Albrecht v. Clifford*, 436 Mass. 706, 715 (2002) (defects in fireplaces were easily seen on inspection; no reason that an inspection could not have been performed at earlier date); *see also Friedman v. Jablonski*, 371 Mass. 482, 486 (1976) (real estate seller's misrepresentation could have been discovered through a reasonably diligent title search before the sale occurred); *Graveline v. BayBank Valley Trust Co.*, 19 Mass. App. Ct. 253, 254 (1985) (alleged misrepresentation as to the age of a roof could have been discovered through a reasonably diligent inspection of the premises).

Schwartz contends that defendants' wrongdoing was "inherently unknowable" to Rodriguez because of the fraudulent nature of the scheme and his remote Texas residency. It was not until December 22, 2009, Schwartz argues, when the Massachusetts Attorney General indicted BEI and others for mortgage fraud, that Rodriguez knew with any degree of certainty that he had actionable claims against the defendants.

Whether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue. *See Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 633 (1st Cir. 1990), quoting *Lavellee v. Listi*, 611 F.2d 1129, 1131-1132 (9th Cir. 1980) ("The determination of when

appellees had knowledge of 'both the injury and its connection with the act of defendant,' is a question of fact."); *Riley v. Presnell*, 409 Mass. 239, 240 (1991) ("[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact."). [9]

Here, however, no independent factual inquiry is required because there can be no dispute that at the very latest, Rodriguez knew that he had been harmed on June 18, 2007, the date on which he mailed Chapter 93A demand letters to Independent Appraisals, Jenkins, and McDermott with regard to the Needham Street, Bellevue Street, and Claybourne Street properties.

---

[9] *Cf. Young v. Lepone*, 305 F.3d 1, 8-9 (1st Cir. 2002) (noting that though timeliness of an action is normally a question of fact, where a particular fact is either admitted or undisputed, circumstances may exist where this inquiry may be determined as a matter of law); *Graveline,* 19 Mass. App. Ct. at 256 ("On the record before the Housing Court judge, the age of the roof, as matter of law, was not inherently unknowable, and the judge rightly allowed a motion to dismiss the complaint as time-barred."). Given that Rodriguez did not visit any of the properties, despite the opportunity and incentive to do so, the court could dismiss on this ground alone because of the burden on Schwartz to show the exercise of reasonable diligence by Rodriguez. *See D.B. Zwirn Special Opportunities Fund L.P. v. Mehrotra*, 2011 WL 317752, at *1 (D. Mass. Jan. 31, 2011), citing *Koe*, 450 Mass. at 101 ("Plaintiff bears the burden of proving both the actual lack of knowledge and the objective reasonableness of that lack of knowledge during the tolling period."). As a practical matter, "[a] physical inspection of real property by or on behalf of the buyer is not uncommon." *Graveline,* 19 Mass. App. Ct. at 256. *Cf. Snyder v. Sperry & Hutchinson Co.*, 368 Mass. 433, 446 (1975) (no duty to investigate potential fraud "if the seller's representations are such as to induce the buyer not to undertake an independent examination of the pertinent facts, lulling him into placing confidence in the seller's assurances.").

Defendants contend that the act of sending this demand letter proves as a matter of law that Rodriguez was aware that he had suffered an actual injury.[10] Schwartz counters that the demand letter was merely an "inquiry," and while it may have indicated a level of suspicion, it did not demonstrate with any certainty Rodriguez's knowledge of the connection between his injury and the defendants' conduct. *See Lindsay v. Romano*, 427 Mass. 771, 775 (1998) (in a medical malpractice action, a letter sent by a patient's lawyer to her doctor accusing him of possible negligence was not dispositive of the issue of the patient's awareness that the doctor's actions might have caused her harm). The argument does not carry its own weight. A Chapter 93A demand letter is by definition a request for relief. *Kanamaru v. Holyoke Mut. Ins. Co.*, 72 Mass. App. Ct. 396, 407 (2008). The demand letter is a prerequisite to suit, *Lingis v. Waisbren*, 75 Mass. App. Ct. 464, 468 (2009), and must describe the underlying

---

[10] That Rodriguez sent this initial June 18, 2007, demand letter to only three of the defendants is of no moment. *See D.B. Zwirn*, 2011 WL 317752, at *2*, citing *Krasnow v. Allen*, 29 Mass. App. Ct. 562, 570 (1990) (the statute of limitations begins to run when there is notice of possible harm even if the identities of all tortfeasors are not yet known). Here, when Rodriguez sent a demand letter to one set of defendants (involving three of the five properties), he knew that he had been harmed. Consequently, the duty to investigate attached, and an "investigation" was undertaken, as evidenced by the subsequent demand letters sent to other of the defendants. *See Koe*, 450 Mass. at 102, citing *Olsen v. Bell Tel. Lab., Inc.*, 388 Mass. 171, 175 (1983) ("[O]ne does not have to fully comprehend the full extent or nature of an injury in order for a cause of action to accrue.").

facts with reasonable specificity. *Piccuirro v. Gaitenby*, 20 Mass. App. Ct. 286, 292 (1985). *Cf. Bressel v. Jolicoeur*, 34 Mass. App. Ct. 205, 211 (1993) (there is no right to relief for an act not recited in the Chapter 93A § 9 demand letter). The facts in *Lindsay* are easily distinguishable in light of the numerous expert medical opinions that the plaintiff-patient had received that had failed to make any connection between her doctor's conduct and her injury. *See Lindsay*, 427 Mass. at 775-776. The court can only conclude from the admitted facts that Rodriguez's tort claims are time barred as of the date of the running of the three-year statute of limitations on June 18, 2010.[11]

Schwartz's fallback position (argued as an alternative to the discovery rule) is that the court should "equitably" toll the statue of limitations because defendants' responses to the demand letters denied any wrongdoing. Equitable tolling is a judicially created doctrine that tolls the running of the statute of limitations where "a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *Bennett ex rel. Estate of Bennett v. United States,* 429 F. Supp. 2d 270, 281 (D. Mass. 2006), quoting *Gonzalez v. United States*, 284 F.3d 281, 291 (1st Cir. 2002). Under the doctrine of fraudulent concealment, equitable tolling will lie where a defendant "engaged in fraud or deliberate concealment of material facts relating to

---

[11] Because the court concludes that the claims accrued on June 18, 2007, it need not address the Trustee's (dubious) assertion that at the time of the closings any injury was inherently unknowable because of the obfuscations of the broker-defendants.

his wrongdoing and the plaintiff [failed] to discover these facts within the normal limitations period despite his exercise of due diligence [because of the defendant's conduct]." *Bennett*, 429 F. Supp. 2d at 281, quoting *Callahan v. United States*, 426 F.3d 444, 454 (1st Cir. 2005); *see also* Mass. Gen. Laws ch. 260, § 12; *Frank Cooke, Inc. v. Hurwitz*, 10 Mass. App. Ct. 99, 106 (1980) (Tolling is appropriate under the statute "if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means for acquiring knowledge of such facts.").

The fraudulent concealment doctrine, however, is not implicated by the facts of this case. The doctrine applies only when acts of fraudulent concealment achieve their goal of preventing a plaintiff from discovering a cause of action – it has no bearing when the alleged acts occur after the cause of action is discovered and a plaintiff has begun to pursue relief. *See D.B. Zwirn*, 2011 WL 317752, at *2 (doctrine not applicable where the alleged fraudulent concealment involved defendant's statements in an affidavit made in the course of litigating a prior suit brought by the plaintiff). *Cf. Bennett*, 429 F. Supp. 2d at 281 (neither equitable tolling nor fraudulent concealment will save a claim where a plaintiff is not diligent in investigating facts of which he is aware). Moreover, mere denials of wrongdoing – as here – are not acts of fraudulent concealment. To be liable under the doctrine, a defendant "must be guilty of some trick

or contrivance tending to exclude suspicion and prevent inquiry." *Rx.com v. Medco Health Solutions, Inc.*, 322 Fed. Appx. 394, 398 (5th Cir. 2009), quoting *State of Texas v. Allan Constr. Co. Inc.*, 851 F.2d 1526, 1532 (5th Cir. 1988); *see also Pesek v. Gates*, 247 Fed. Appx. 62, 64 (9th Cir. 2007); *Whitlock Corp. v. Deloitte & Touche, L.L.P.*, 233 F.3d 1063, 1067 (7th Cir. 2000).[12]

### Chapter 93A

A Chapter 93A claim must be commenced within four years of an injury. *See* Mass Gen. Laws ch. 260, § 5A. For purposes of analysis, the court will use June 18, 2007, rather than the dates of the closing as marking the accrual of a discoverable cause of action.[13]

---

[12] It must also be noted that Rodriguez is a poor candidate for equitable relief. Equity will shun a plaintiff who himself has unclean hands. *See Bennett*, 429 F. Supp. 2d at 280, quoting *Rakes v. United States*, 442 F.3d 7, 9 (1st Cir. 2006). Rodriguez stood to profit $10,000 at the closing on each of the five properties as his share of the illicit proceeds. Moreover, there is no indication in the Complaint that he was anything but a willing signatory on loan applications that contained statements about his personal circumstances that he would have known were false. In all lights, Rodriguez stands before the court not as a victim, but as a frustrated coconspirator. *See Smith v. Jenkins*, 2011 WL 4793227, at *2 (D. Mass. Oct. 11, 2011).

[13] If the causes of action accrued at the time of the closings, only the Claybourne Street property could be the subject of a Chapter 93A claim, as that closing is the only one that occurred within the applicable four-year limitations period. On the other hand, whether any of the Trustee's underlying tort claims survive the statute of limitations is not relevant to the analysis. *See Patricia Kennedy & Co., Inc. v. Zam-Cul Enters., Inc.*, 830 F. Supp. 53, 59 (D. Mass. 1993) (valid Chapter 93A claim does not depend on alleging and proving a separate, independent tort: "[A] claim under Chapter 93A

A prerequisite to filing a Chapter 93A, § 9 claim is a proper demand letter. *See Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 287 (1985), quoting *Entrialgo v. Twin City Dodge*, 368 Mass. 812, 813 (1975) ("We have often held that '[a] demand letter listing the specific deceptive practices claimed is a prerequisite to suit and as a special element must be alleged and proved . . . .'"); *Lingis*, 75 Mass. App. Ct. at 468-471 (where there was no evidence that the demand letter had been sent, received, or replied to, the Chapter 93A claim necessarily failed). Allegations that Rodriguez sent demand letters to Independent Appraisals, Jenkins, McDermott, Amato, Keller, and Daye satisfy the prerequisite for suit against these defendants.[14] *See Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 704 (1975).

"To prevail on a Chapter 93A claim, the plaintiff 'must prove that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result.'" *Morris v. BAC Home*

_____

rises or falls on its own merit."). It is true that a Chapter 93A violation will fail where it is entirely derivative of a common-law claim that lacks supporting evidence. *See Pimental v. Wachovia Mortg. Corp.,* 411 F. Supp. 2d 32, 40 (D. Mass. 2006), citing *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 47 (D. Mass. 1997). Here, however, where the common-law claims are barred by the statute of limitations, and are not being dismissed on their merits, the Chapter 93A claims stand independently.

[14] Rodriguez admits that no demand letter was ever served on attorney Gladstone and for that reason, (as the court stated at the hearing), his motion to dismiss the (remaining) Chapter 93A claim against him must be allowed. The same result applies to Worldwide.

*Loans Servicing, L.P.*, 775 F. Supp. 2d 255, 258-259 (D. Mass. 2011), citing *Brandon Assocs., LLC v. FailSafe Air Safety Sys. Corp.*, 384 F. Supp. 2d 442, 446 (D. Mass. 2005). In essence, the Trustee maintains that the appraiser defendants engaged in unfair and deceptive conduct by grossly exaggerating the market value of the five properties. She further contends that the brokers deliberately failed to disclose material information to Rodriguez or to represent his interests at the closing. As a result, she alleges that Rodriguez's credit was ruined, causing him severe financial harm.

Whether an act or practice is unfair or deceptive depends "on the nature of challenged conduct and on the purpose and effect of that conduct . . . ." *Massachusetts Emp'rs Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 42 (1995). Schwartz alleges that the appraisers negligently valued each of the properties by as much as $100,000 above its fair market value by misrepresenting the desirability of the neighborhoods in which it was located or by using "uncomparable" comparables.[15] Although a "negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment" is unfair and deceptive under Chapter 93A, *see Golber v. BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 261 (1999), quoting *Glickman v. Brown*, 21

_____

[15] Moreover, Schwartz fails to allege the basis of any duty of care that the appraisers might conceivably have owed to Rodriguez. The Complaint states that BEI, and not Rodriguez, commissioned the appraisers to evaluate the properties. It does not allege any direct dealings by the appraisers with Rodriguez.

Mass. App. Ct. 229, 235 (1985), an appraisal is not a representation of fact, but instead the expression of an educated opinion. *See* S. Williston, *A Treatise on the Law of Contracts* § 69:8 (4th ed. 2011) ("The statement of value set forth in a real property appraisal is not per se a factual representation of the sort which will support a fraud case; to the contrary, it has been said that real estate appraisals are generally considered statements of opinion, rather than statements of fact, for purposes of fraud or concealment claims, and that erroneous or inaccurate appraisals will not support fraud claims absent special circumstances.").[16]

The Trustee alleges that BEI "enticed" Rodriguez to purchase the properties by showing him copies of the appraisals, which listed property values that matched (or nearly matched) the purchase prices BEI assigned in the purchase and sale agreements. She further alleges that the overvaluation of the properties was a result of collusion between BEI and the appraisers. The actual appraisals, however, give little support to the allegation. The valuations they contain are not all that different from the publicly disclosed Multiple Listing Service (MLS) prices.[17]

_____

[16] An inaccurate appraisal will support a claim sounding in fraud when "the intent to deceive motivates the inaccuracy." Williston § 69:8.

[17] The Spencer Avenue property in December of 2006 was appraised at $440,000; it listed on the MLS for $360,000; BEI held an option for $342,000; and Rodriguez purchased it for $440,000. The Essex Street property in November of 2006 was appraised at $475,000; it listed on the MLS for $475,000; BEI held an option for

Where a Chapter 93A action sounds in fraud, a plaintiff must plead such fraud with particularity. *See Martin v. Mead Johnson Nutrition Co.*, 2010 WL 3928707, at *3 (D. Mass. 2010), citing *Crisp Human Capital Ltd. v. Authoria Inc.*, 613 F. Supp. 2d 136, 139 (D. Mass. 2009) ("A claim under Chapter 93A that involves fraud is subject to the heightened pleading requirement [of Rule 9(b)]."). Because the appraisals on their face do not raise the specter of intentional deceit, additional facts are needed to support an allegation that the appraisers intentionally over-valued the properties to deceive Rodriguez.[18] *See Mear v. Sun Life Assurance Co. of Canada (U.S.)/Keyport Life Ins. Co.,* 2008 WL 245217, at *8 (D. Mass. 2008), citing *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194 (1st Cir. 1996) (conclusory allegations of plans or schemes to defraud are insufficient under Rule 9(b)). That BEI held options to

---

$405,000; and Rodriguez purchased it for $475,000. The Needham Street property was appraised at $510,000 in December of 2006; it listed on the MLS for $499,000; BEI held an option for $350,000; and Rodriguez purchased the property for $450,000. The Bellevue Street property was appraised at $500,000 in February of 2007; it listed on the MLS for $499,900; BEI's option was $400,000; and Rodriguez purchased the property for $500,000. The Claybourne Street property was appraised in January of 2007, for $530,000; its MLS listing price was $479,900; BEI's option was $425,000; and Rodriguez purchased it for $527,500.

[18] Schwartz does not point to any specific misrepresentations by the appraisers that supported the overvaluation of the properties; she claims only that the valuations given failed to reflect a collapsing real estate market. *Cf. Martin,* 2010 WL 3928707, at *3 (plaintiff appended the allegedly fraudulent printed advertisements on which she relied and quoted them in her complaint).

purchase the properties that were significantly less than the appraised value (or the MLS price), without more, does not establish an intent to deceive on the appraisers' part (whatever it may say about BEI's intentions).[19]

With respect to the brokers, Schwartz alleges that their failure to fully disclose to Rodriguez their relationship with BEI was deceptive and unfair. "A duty to disclose exists where '(i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction.'" *Knapp v. Neptune Towers Assocs.*, 72 Mass. App. Ct. 502, 507 (2008), quoting *Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass. App. Ct. 747, 763 (2003). Although a finding of unfair or deceptive conduct need not fall neatly into statutory or common-law proscriptions, *see Commonwealth v. Fremont Inv. & Loan,* 452 Mass. 733, 742-743 (2008), a Chapter 93A violation based on a common-law precept will be analyzed accordingly.

Assuming that the brokers owed a fiduciary duty to Rodriguez, nothing in the pleadings suggests that any undisclosed fact about the brokers' relationship with BEI or the manner in which BEI intended to profit from the sales would have deterred

_____

[19] As for a motive to act deceptively, Schwartz alleges only that the appraisers benefitted by receiving a "continuing stream of business" from BEI, Brown, and Frank.

Rodriguez from participating in the scheme. He was a willing participant in an undertaking that any reasonable person would have recognized as suspicious, if not downright fraudulent. Rodriguez stood to make a total of $50,000 for his role as a straw buyer without having to put any skin of his own into the game. Given Rodriguez's complicit role in the scheme, the brokers could reasonably have assumed that he was perfectly content to remain ignorant of the ruminations of the cash cow. Schwartz has pled no facts to the contrary.[20]

## ORDER

For the foregoing reasons, the motions to dismiss brought by defendants Independent Appraisals, Jenkins, McDermott, Amato, Gladstone, Keller, Daye, and Worldwide are <u>ALLOWED</u>. Attorney Gladstone's motion for costs and sanctions is <u>DENIED</u>, as unmerited on the facts. The Clerk will now close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[20] Schwartz alleges that the brokers were paid several thousand dollars at each closing for their services. The argument that they should return these fees because they performed little to no services for Rodriguez has no traction for Chapter 93A purposes. *See Shawmut Bank, N.A. v. Wayman,* 34 Mass. App. Ct. 20, 25-26 (1993) (merely providing bad service does not constitute acting in bad faith).